IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| JLR GLOBAL, LLC, JENNA RYAN REALTY, LLC, JENNA RYAN REAL ESTATE. LLC, FIRST PLACE REAL ESTATE, SELFLOVEU, LLC, THE JENNA RYAN SHOW, DOTJENNA, and JENNIFER RYAN, <br><br>    Plaintiffs, <br><br>    v. <br><br>PAYPAL INC., <br><br>    Defendant. | CIVIL ACTION NO.: 4:22-cv-559 <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

In compliance with this Court's Order and Advisory (ECF No. 4), the Plaintiffs in the above-captioned case – Plaintiffs JLR Global, LLC, Jenna Ryan Realty, LLC, Jenna Ryan Real Estate, LLC, First Place Real Estate, SelfLoveU, LLC, The Jenna Ryan Show, dotJenna, and Jennifer Ryan (collectively "Plaintiffs") – hereby amend their original state court petition, against originally named defendant PayPal Holding Co., into this Complaint against PayPal, Inc. ("Defendant").

## PARTIES

1.    Plaintiff JLR Global LLC ("Global") is a Texas limited liability company, having its primary office at 2011 Lakeview Parkway, Flower Mound, TX 75028 – located in Denton County, Texas. Global is a Series LLC within the meaning of Texas Business Organizations Code, Subchapter M, Sections 101.601 et seq.

2.    Plaintiff Jenna Ryan Realty, LLC ("Realty") is a Texas limited liability company, having its primary office at 2011 Lakeview Parkway, Flower Mound, TX 75028 – located in Denton County, Texas. Jenna Ryan Realty, LLC is a name under the Series LLC.

3. Plaintiff Jenna Ryan Real Estate, LLC ("Real Estate") is a Texas limited liability company, having its primary office at 2011 Lakeview Parkway, Flower Mound, TX 75028 – located in Denton County, Texas. Jenna Ryan Real Estate, LLC is a name under the Series LLC.

4. Plaintiff SelfLoveU, LLC ("Self") is a Texas limited liability company, having its primary office at 2011 Lakeview Parkway, Flower Mound, TX 75028 – located in Denton County, Texas. SelfLoveU, LLC is a name under the Series LLC.

5. Plaintiff First Place Real Estate ("FPRE") is an assumed name under which Real Estate now operates.

6. Plaintiff The Jenna Ryan Show ("Show") is a Texas company, having its primary office at 6160 Warren Pkwy, Suite 100, Frisco, TX 75034.

7. Plaintiff dotJenna ("Dot") is a Texas company, having its primary office at 6160 Warren Pkwy, Suite 100, Frisco, TX 75034.

8. Plaintiff Jennifer Ryan ("Ryan") is an individual domiciled in the State of Texas, who owns and operates the other Plaintiffs.

9. Defendant PayPal, Inc. ("PayPal") is a Delaware corporation, with a principal place of business at 2211 N 1st St San Jose, CA 95131. Defendant's Registered Agent for service of process in Texas appears to be CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

**JURISDICTION AND VENUE**

10. This action arises under the commerce and trade laws of the United States, Title 15 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(a), and 15 U.S.C. § 1693.

11. This Court has supplemental jurisdiction over Plaintiffs' claims arising under the laws of Texas, pursuant to 28 U.S.C. § 1367(a), because these claims are so related to Plaintiffs' claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative fact(s).

12. Venue is proper in this district under 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to the claims in this complaint occurred in this district.

Furthermore, Defendant submitted itself to the jurisdiction and venue of this Court by removing the Plaintiffs' previously pending state court action to this Court.

13. Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and/or the Texas Long Arm Statute, due at least to its substantial business in this forum, including regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Texas and in this Judicial District.

## FACTS COMMON TO ALL CLAIMS

14. At some time in or prior to 2008, Ryan established an account with Defendant in order to utilize Defendant's electronic funds transfer services – at first for personal transactions, and thereafter for a mix of personal and business transactions.

15. In order establish that account, Ryan was required to complete Defendant's online "agreement" forms. The agreement forms that Ryan completed were online, and electronic, in nature. Ryan does not have a copy of those agreement forms, but Defendant is believed to be in possession of the original forms.

16. As is the case with most people, Ryan gave the online agreement forms a cursory review, without analyzing or researching each and every provision of that agreement, so that she could just move on with setting up the account and getting on with her business.

17. On January 21, 2021 at 6:45 pm Central time, Ryan received an email notification from Defendant (*i.e.*, service@paypal.com) terminating Ryan's account (*see* Exhibit A). Defendant indicated that it was no longer bound to the terms of its agreement with Ryan from 13 years before. Defendant's justification for its termination of the agreement was a factually incorrect claim that Ryan had somehow violated Defendant's "Acceptable Use" policy.

18. On January 21, 2021 at 7:31 pm Central time, Ryan received an email from CNET News Staff Reporter Laura Hautala **stating "PayPal has told me that they shut down and account for Jenna Ryan** because she is fundraising for purposes other than legal defense in violation of the company's policies" (*see* Exhibit B).

19. On January 21, 2021 at 7:49 pm Central time, CBS News reporter Kate Smith:



posted (a "Tweet") on Twitter.com:





[4]

linking readers to an article she published at CBS News (cbsnews.com) about PayPal "booting" Ryan.

20. On January 21, 2021 at 7:49 pm Central time (updated at 9:25 pm Central), CBS News (cbsnews.com) published the article by Kate Smith, which **stated PayPal spokesperson Kim Eichorn sent CBS an email** notifying CBS of the fact that PayPal had closed Ryan's Personal Account (*see* Exhibit C).

21. At that time, Kim Eichorn was a Manager in Defendant's "Reputation Management" organization:



22. On January 22, 2021 at least 28 separate online news articles were published about PayPal canceling Ryan's account.

23. That same day, the Plaintiffs' accounts with a number of electronic funds transfer services (*e.g.*, Fundly; *see* Exhibit D) were canceled, in addition to Plaintiffs' accounts on a variety of social media sites such as FaceBook and Instagram.

24. On January 25, 2021 Plaintiffs were wrongfully evicted from their corporate office location in Frisco, Texas, in response to the press activity generated by Defendant's illegal disclosure of Ryan's private personal financial information to news and media outlets.

25. Plaintiffs incurred extensive financial losses – both immediate and long-term – amounting to millions of dollars, caused by Defendant's illegal disclosure of Ryan's private personal financial information to news and media outlets.

26. Ryan suffered severe emotional distress – including, but not limited to, mental anguish, embarrassment, humiliation, and worry – as a result of Defendant's illegal disclosure of Ryan's private personal financial information to news and media outlets.

## COUNT I
## DEFENDANT'S VIOLATION OF 15 U.S.C. § 1693(a)(9)

27. Plaintiffs herein restate and incorporate by reference paragraphs 14 – 26, above.

28. Pursuant to 15 U.S.C. §§ 1693(m)(a)(1) and 1693(m)(a)(3), Defendant is liable for the damages caused to Plaintiffs, in addition to the costs of this action and attorney's fees, for Defendant's intentional violation of 15 U.S.C. § 1693(a)(9).

29. Under 15 U.S.C. § 1693, Ryan is a consumer, who had an account with Defendant for electronic fund transfer service.

30. Under 15 U.S.C. § 1693, Defendant was a financial institution holding an account belonging to Ryan.

31. At the time that Ryan accepted Defendant's agreement for electronic fund transfer service (with Defendant), Defendant's terms and conditions of electronic fund transfers should have disclosed under what circumstances Defendant would, in the ordinary course of business, disclose information concerning the Ryan's account to third persons.

32. To the extent that Defendant's terms and conditions did disclose under what circumstances Defendant would – in the ordinary course of business – disclose information

concerning the Ryan's account to third persons, those disclosures did not state, indicate, or suggest that Defendant would send immediate notifications to national news and media outlets when it terminated Ryan's account.

33. Defendant's immediate notifications to – at least CNET News staff and CBS News – that PayPal had just terminated Ryan's accounts failed to comply with – and intentionally violated – the requirements of 15 U.S.C. § 1693(a)(9).

34. Defendant's notifications to news outlets, such as CNET News and CBS News, constituted a de facto press release ("Press Release") by Defendant that it terminated its relationship with Ryan.

35. Defendant's intentional violations of 15 U.S.C. § 1693(a)(9) caused Ryan and the other Plaintiffs actual damages – including immediate and ongoing business losses amounting to millions of dollars – in additional to causing Ryan severe emotional distress including, but not limited to, mental anguish, embarrassment, humiliation, and worry.

36. Defendant's violations of 15 U.S.C. § 1693(a)(9) were of their own volition, and clearly intentional in nature. The Defendant was clearly more concerned with its "reputation management" than it was legal ramifications of its actions.

37. In addition to the financial damages that Defendant caused Plaintiffs, Plaintiffs are entitled to recover the costs of this action in addition to reasonable attorney's fees as this Court determines under 15 U.S.C. § 1693(m)(a)(3).

## COUNT II
### DEFENDANT'S TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS UNDER TEXAS LAW

38. Plaintiffs herein restate and incorporate by reference paragraphs 14 – 37 above.

39. As detailed in paragraphs 27 – 37, above, Defendant's conduct was independently unlawful under 15 U.S.C. § 1693.

40. Defendant's conduct was the proximate cause of the Plaintiffs' damages – including immediate and ongoing business losses amounting to millions of dollars, as well as severe emotional distress. Defendant had no legitimate legal basis to issue its Press Release about terminating Ryan's account. Rather, Defendant's illegal and intentional publicity of its

termination of Ryan's account was intended to damage Ryan, for the sake of "reputation management" by the Defendant.

41.     Defendant was more concerned with managing its reputation – by appeasing and currying favor with social media cancel culture trends that clamored for the deplatforming, marginalization, shaming, and financial and social ostricization of Ryan and others like her, based solely upon her personal political views and opinions – than it was with properly protecting Ryan's privacy or the risks of severe damage to Ryan caused by its Press Release.

42.     Starting on the very next day after Defendant's illegal Press Release, other electronic funds transfer services followed the Defendant's lead and began to "cancel" Ryan by terminating her accounts with those services. In similar fashion, Plaintiffs' accounts on a variety of social media sites – such as FaceBook and Instagram – also began to follow Defendant's lead and cancel Ryan and the other Plaintiffs by terminating their accounts for those social media sites.

43.     Given the nature of the Plaintiffs' businesses, access to commonly used financial services and social media platforms were absolutely crucial to maintaining existing clientele and attracting new business. Ryan spent well over a decade building the Plaintiffs, their businesses, and their clientele, and had a very favorable reputation among her clients – in addition to an established track record of securing new business (*see* Exhibits E and F).

44.     The Defendant's illegal Press Release about it terminating its relationship with Ryan was the keystone in what soon became an avalanche of similar "cancel and publicize" actions against Ryan and the Plaintiffs by other companies, following the lead of the Defendant.

45.     As a result of Defendant's illegal Press Release – and the resulting cascade of copycat decisions by other companies – Plaintiffs lost prospective real estate contracts and listings from existing clients and potential new clients (*see* Exhibits E and F).

46.     Given the social conditions at the time of Defendant's wrongful and illegal notification to the press of its cancelation of Ryan, Defendant knew that interference with Plaintiffs' prospective business relationships was substantially certain to occur as a result. Defendant knew that Ryan and the other Plaintiffs were in the real estate business. Defendant

also knew that its illegal actions would damage Plaintiffs ability to attract new business and retain the business they already had.

47. But for the Defendant's illegal Press Release – and the easily foreseeable cascade of copycat actions triggered by Defendant's illegal Press Release – there was a very high probability that Plaintiffs would have continued to do repeat business with their existing clientele, and would have continued to attract new business and clientele.

48. The Defendant's illegal Press Release was the proximate cause of Plaintiffs losing new business opportunities, and losing business from existing clientele – amounting to millions of dollars in lost income and revenue. Soon after, Ryan was forced to change the name of her real estate business to First Place Real Estate and, essentially, start over rebuilding her business from nothing.

49. Defendant is liable to Plaintiffs for the business revenue lost immediately following their illegal action, and the loss to Plaintiffs future revenues that will continue on for years to come. Defendant is also liable for causing Ryan severe emotional distress including, but not limited to, mental anguish, embarrassment, humiliation, and worry.

## COUNT III
### DEFENDANT'S VIOLATION OF DECEPTIVE TRADE PRACTICES ACT UNDER TEXAS LAW

50. Plaintiffs herein restate and incorporate by reference paragraphs 14 – 49, above.

51. As detailed in paragraphs 27 – 37, above, Defendant's conduct was independently unlawful under 15 U.S.C. § 1693.

52. Ryan is a person under the Texas Deceptive Trade Practices Act ("DTPA"). Ryan sought or acquired the services of Defendant. The services of the Defendant were acquired by purchase. For each transaction Plaintiffs utilized Defendant's services for – whether it be buying or selling – Defendant received a transaction fee. Ryan is therefore a consumer under the DTPA.

53. Under the DTPA, Defendant is a person. Defendant committed an unconscionable act in connection with the services it provided to Ryan. The Defendant can be sued under the DTPA.

54. Defendant committed a wrongful, unconscionable, and illegal act in connection with the services it previously provided to Ryan. Defendant intentionally circulated its illegal Press Release within minutes of – if not concurrent with – its termination of Ryan's account. The illegal Press Release was more than detrimental to Ryan and the other Plaintiffs, and Defendant took advantage of Ryan's lack of experience and/or capacity to counter or otherwise respond to the Press Release. The resulting unfairness to Ryan and the other Plaintiffs was glaringly noticeable, flagrant, and unmitigated.

55. The Defendant's illegal Press Release was a producing cause of Plaintiffs losing new business opportunities, and losing business from existing clientele (*see* Exhibits E and F). Soon after, Ryan was forced to change the name of her real estate business to First Place Real Estate and, essentially, start over rebuilding her business from nothing.

56. Defendant's unconscionable act(s) caused Plaintiffs to lose business revenue immediately, and causes Plaintiffs to lose future business revenues for years to come. Defendant's unconscionable act(s) further caused Ryan severe mental anguish and emotional distress including, but not limited to, mental anguish, embarrassment, humiliation, and worry.

57. Under the DTPA, Defendant is liable to Plaintiffs for Plaintiffs' lost profits and lost time. Defendant is further liable to Ryan for past and future mental anguish resulting from Defendant's intentional violation of 15 U.S.C. § 1693(a)(9).

58. Under the DTPA, Defendant is liable to Plaintiffs additional damages due to the intentional nature of Defendant's illegal action(s), and Defendant's awareness of the fact that Ryan had no viable way to stop or counter Defendant's Press Release.

## COUNT IV
## DEFENDANT'S INVASION OF PRIVACY UNDER TEXAS LAW

59. Plaintiffs herein restate and incorporate by reference paragraphs 14 – 58, above.

60. As detailed in paragraphs 27 – 37, above, Defendant's conduct was independently unlawful under 15 U.S.C. § 1693.

61. Defendant's illegal public disclosure of private facts concerning the Defendant's termination of Ryan's account constitutes invasion of privacy under Texas law.

62. Defendant's illegal Press Release disseminated Defendant's termination of Ryan's account to the public at large. The Press Release resulted in numerous news reports Defendant's action against Ryan (*see, e.g.*, Ex. C).

63. The termination of Ryan's account by Defendant was not a matter already known to the public or a matter of public record, until Defendant's illegal Press Release.

64. Defendant intentionally circulated its illegal Press Release within minutes of – if not concurrent with – its termination of Ryan's account. Defendant placed the account termination in public view, not Ryan.

65. Defendant's intentional circulation of its illegal Press Release was made by Defendant's "Reputation Management" organization – indicating that Defendant intentionally placed the matter into public view.

66. At the time that Defendant made its illegal Press Release, the publicity of the Press Release itself, and the torrent of negative publicity that the Press Release triggered, was an extremely embarrassing and highly offensive public disclosure of Ryan's private financial information.

67. At the time that Defendant made its illegal Press Release, there was no legitimate public interest in embarrassing information about the termination of Ryan's account with Defendant. Defendant's termination of Ryan's account, and its termination of the agreement, was based upon a factually false claim that Ryan had somehow violated Defendant's "Acceptable Use" policy in the agreement.

68. The Defendant's illegal Press Release was the proximate cause of Plaintiffs losing new business opportunities, and losing business from existing clientele (*see, e.g.*, Exhibits E and F) – amounting to millions of dollars in losses for Plaintiffs. Soon after, Ryan was forced to change the name of her real estate business to First Place Real Estate and, essentially, start over rebuilding her business from nothing.

69. Defendant is liable to Plaintiffs for the business revenue lost immediately following their illegal action, and the loss to Plaintiffs future revenues that will continue on for years to come. Defendant is also liable for causing Ryan severe emotional distress including, but not limited to, mental anguish, embarrassment, humiliation, and worry.

70. Defendant is further liable to Ryan and the other Plaintiffs for additional damages – including actual damages, exemplary damages, interest, court costs and attorney's fees.

## COUNT V
## DEFENDANT'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER TEXAS LAW

71. Plaintiffs herein restate and incorporate by reference paragraphs 14 – 70, above.

72. As detailed in paragraphs 27 – 37, above, Defendant's conduct was intentional and independently unlawful under 15 U.S.C. § 1693.

73. Ryan is a person, and she seeks relief under this count in her individual capacity. This count is pleaded in the alternative to any available damages for emotional distress in the other counts of this complaint.

74. Defendant's conduct, in the form of its Press Release, was intentional. Given the circumstances at the time of Defendant's Press Release and the Defendant's conduct, the Defendant acted to intentionally cause Ryan emotional distress.

75. In the alternative, Defendant's Press Release was reckless. Defendant had reason to know of facts that created a high risk of harm to Ryan, and yet deliberately proceeded with its Press Release with conscious disregard or indifference to the risk of harm to Ryan.

76. Defendant was more concerned with its own "reputation management" that it was with the propriety of its actions, or the likely and foreseeable results of those actions.

77. Defendant's illegal and unconscionable act(s) caused Ryan severe mental anguish and emotional distress including, but not limited to, mental anguish, embarrassment, humiliation, and worry. Ryan's entire livelihood was immediately placed in jeopardy, and has since been damaged to a point where she may never recover.

78. Defendant's illegal and unconscionable act(s) were extreme and outrageous. Defendant and Ryan had a private financial relationship, in which Ryan trusted Defendant with her private financial and banking information, and trusted Defendant to maintain and protect the confidentiality and privacy of her private financial information. Defendant had no legitimate legal basis to issue its Press Release about terminating Ryan's account.

79. Rather, Defendant's illegal and intentional publicity of its termination of Ryan's account was done for the sake of its own "reputation" – intended to appease and curry favor with social media cancel culture trends that clamored for the deplatforming, marginalization, shaming, and financial and social ostricization of Ryan and others like her, based solely upon her personal political views and opinions.

80. The Defendant's illegal Press Release caused Ryan severe emotional distress including, but not limited to, mental anguish, embarrassment, humiliation, and worry.

81. At the time Defendant issued its illegal Press Release, Ryan lacked the experience and/or capacity to counter the Press Release, or to otherwise redress the harm being done to her reputation and that of the other Plaintiffs.

82. Defendant is liable to Ryan for past and future mental anguish that foreseeably and predictably cause by Defendant's illegal and unconscionable act(s).

## DEMAND FOR JURY TRIAL

Plaintiffs, under Rule 38 of the Federal Rules of Civil Procedure, request a trial by jury of any issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter:

a. A judgment in favor of Plaintiffs that Defendant intentionally violated 15 U.S.C. § 1693(a)(9);

b. A judgment in favor of Plaintiffs that Defendant intentionally committed Tortious Interference with Prospective Relations against Plaintiffs under Texas State law;

c. A judgment in favor of Ryan that Defendant intentionally violated the Texas Deceptive Trade Practices Act ("DTPA") with respect to Ryan;

d. A judgment in favor of Ryan that Defendant intentionally committed Invasion of Privacy against Ryan under Texas State law;

e. A judgment in favor of Ryan that Defendant committed Intentional Infliction of Emotional Distress against Ryan under Texas State law;

f. A judgment and order requiring Defendant to pay Plaintiffs monetary damages in the amount of $15,000,000.00 – in addition to awarding Plaintiffs' attorney's fees, costs,

expenses, enhanced and/or exemplary damages, and pre-judgment and post-judgment interest – for Defendant's intentional and illegal acts against Plaintiffs and the resulting damages to Plaintiffs' businesses;

g. A judgment and order requiring Defendant to pay Ryan monetary damages in the amount of $5,000,000.00 – in addition to Ryan's attorney's fees, costs, expenses, enhanced and/or exemplary damages, and pre-judgment and post-judgment interest – for Defendant's intentional infliction of emotional distress upon Ryan;

h. A permanent injunction enjoining Defendant and its officers, directors, agents, employees, staff, contractors, and any others purporting to represent Defendant – in the name of Defendant's "reputation management" – from disclosing or otherwise publicizing information about its termination of individuals' accounts without providing sufficient notice to such individuals and affording them an opportunity to rebut or refute such information, or to obtain a court order prohibiting such disclosure or publicity; and

i. Any and all other relief to which Plaintiffs may show themselves to be entitled.

August 9, 2022                                   Respectfully Submitted,


                                                 By:  /s/ *Ronald W. Burns*

                                                     Ronald W. Burns (*Lead Counsel*)
                                                     Texas State Bar No. 24031903
                                                     Fresh IP, PLC
                                                     5999 Custer Road, Suite 110-507
                                                     Frisco, Texas 75035
                                                     972-632-9009
                                                     ron@freship.com

                                                     **ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5.  As such, the foregoing was served on all counsel of record who have consented to electronic service.  Local Rule CV-5.  Pursuant to Fed. R. Civ. P. 5 and Local Rule CV-5, all others not deemed to have consented to electronic service will be served with a true and correct copy of the foregoing by email, on this the 9th day of August, 2022.

/s/ Ronald W. Burns
Ronald W. Burns, Esq.